UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------------x

DANIELLE ADAMS and DEAN
DELLAVENTURA, Individually and On Behalf
of All Others Similarly Situated,

               Plaintiffs,

vs.

MFS CAPITAL OPPORTUNITIES FUND, MFS
CORE GROWTH FUND, MFS EMERGING
GROWTH FUND, MFS GROWTH
OPPORTUNITIES FUND, MFS LARGE CAP
GROWTH FUND, MFS MANAGED SECTORS
FUND, MFS MID CAP GROWTH FUND, MFS
NEW DISCOVERY FUND, MFS NEW
ENDEAVOR FUND, MFS RESEARCH FUND,
MFS STRATEGIC GROWTH FUND, MFS
TECHNOLOGY FUND, MASSACHUSETTS
INVESTORS GROWTH STOCK, MFS MID
CAP VALUE FUND, MFS RESEARCH
GROWTH AND INCOME FUND, MFS
STRATEGIC VALUE FUND, MFS TOTAL
RETURN FUND, MFS UNION STANDARD
EQUITY FUND, MFS UTILITIES FUND, MFS
VALUE FUND, MASSACHUSETTS
INVESTORS TRUST, MFS AGGRESSIVE
GROWTH ALLOCATION FUND, MFS
CONSERVATIVE ALLOCATION FUND, MFS
GROWTH ALLOCATION FUND, MFS
MODERATE ALLOCATION FUND, MFS
BOND FUND, MFS EMERGING MARKETS
DEBT FUND, MFS GOVERNMENT LIMITED
MATURITY FUND, MFS GOVERNMENT
MORTGAGE FUND, MFS GOVERNMENT
SECURITIES FUND, MFS HIGH INCOME
FUND, MFS HIGH YIELD OPPORTUNITIES
FUND, MFS INTERMEDIATE INVESTMENT
GRADE BOND FUND, MFS LIMITED
MATURITY FUND, MFS RESEARCH BOND
FUND, MFS STRATEGIC INCOME FUND,
MFS ALABAMA MUNICIPAL BOND FUND,

**[CAPTION CONTINUES ON NEXT PAGE]**

----------------------------------------x

Civil Action No.

**CLASS ACTION COMPLAINT**

<u>**JURY TRIAL DEMANDED**</u>

**03 CV 12536 WGY**

MAGISTRATE JUDGE _____

AMOUNT $ 150
SUMMONS ISSUED YES
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
    12/17/03

```
————————————————————————— x
MFS ARKANSAS MUNICIPAL BOND FUND,          :
MFS CALIFORNIA MUNICIPAL BOND FUND,        :
MFS FLORIDA MUNICIPAL BOND FUND,           :
MFS GEORGIA MUNICIPAL BOND FUND,           :
MFS MARYLAND MUNICIPAL BOND FUND,          :
MFS MASSACHUSETTS MUNICIPAL BOND           :
FUND, MFS MISSISSIPPI MUNICIPAL BOND       :
FUND, MFS MUNICIPAL BOND FUND, MFS         :
MUNICIPAL LIMITED MATURITY FUND,           :
MFS NEW YORK MUNICIPAL BOND FUND,          :
MFS NORTH CAROLINA MUNICIPAL BOND          :
FUND, MFS PENNSYLVANIA MUNICIPAL           :
BOND FUND, MFS SOUTH CAROLINA              :
MUNICIPAL BOND FUND, MFS TENNESSEE         :
MUNICIPAL BOND FUND, MFS VIRGINIA          :
MUNICIPAL BOND FUND, MFS WEST              :
VIRGINIA MUNICIPAL BOND FUND, MFS          :
EMERGING MARKETS EQUITY FUND, MFS          :
GLOBAL EQUITY FUND, MFS GLOBAL             :
GROWTH FUND, MFS GLOBAL TOTAL              :
RETURN FUND, MFS INTERNATIONAL             :
GROWTH FUND, MFS INTERNATIONAL             :
NEW DISCOVERY FUND, MFS                    :
INTERNATIONAL VALUE FUND, MFS              :
RESEARCH INTERNATIONAL FUND, MFS           :
CASH RESERVE FUND, MFS GOVERNMENT          :
MONEY MARKET FUND, MFS MONEY               :
MARKET FUND, MFS FIXED FUND                :
(collectively known as "MFS FUNDS"); MFS   :
MUNICIPAL SERIES TRUST, MFS SERIES         :
TRUST I, MFS SERIES TRUST II, MFS SERIES   :
TRUST III, MFS SERIES TRUST IV, MFS        :
SERIES TRUST V, MFS SERIES TRUST VI,       :
MFS SERIES TRUST VII, MFS SERIES TRUST     :
VIII, MFS SERIES TRUST IX, MFS SERIES      :
TRUST X, AND MFS SERIES TRUST XI           :
(collectively known as the "MFS FUNDS      :
REGISTRANTS"); SUN LIFE FINANCIAL          :
INC.; MASSACHUSETTS FINANCIAL              :
SERVICES COMPANY (d/b/a "MFS               :
INVESTMENT MANAGEMENT"), and JOHN          :
DOES 1-100,                                :
                                           :
                Defendants.                :
————————————————————————— x
```

Plaintiffs allege the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports and advisories about the MFS Funds (as defined in the caption of this case), press releases, and media reports about the MFS Funds. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired shares or other ownership units of one or more of the mutual funds in the MFS family of funds (*i.e.*, the MFS Funds as defined in the caption, above) between December 15, 1998 and December 7, 2003, inclusive, and who were damaged thereby. Plaintiffs seek to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act") and the Investment Advisers Act of 1940 (the "Investment Advisers Act") (the "Class").

2. This action charges defendants with engaging in an unlawful and deceitful course of conduct designed to improperly financially advantage defendants to the detriment of plaintiffs and the other members of the Class. As part and parcel of defendants' unlawful conduct, the Fund Defendants, as defined below, in clear contravention of their fiduciary responsibilities, and disclosure obligations, failed to properly disclose that select favored customers were improperly allowed to "time" their mutual fund trades. Such timing, as more fully described herein, improperly allows an investor to trade in and out of a mutual fund to exploit short-term moves and inefficiencies in the manner in which the mutual funds price their shares.

3. On December 7, 2003, before the market opened, Sun Life, defined below, announced in a press release over *PR Newswire* that the Securities and Exchange Commission

("SEC") intended to commence an enforcement action against MFS Company, defined below, "alleging, in effect, that the disclosure in certain of MFS' fund prospectuses concerning market timing was false and misleading, and breach of fiduciary duty."

4.  On that same day, MFS Company, defined below, sent a letter to MFS Funds shareholders, posted on MFS' website, revealing the SEC investigation, and that MFS Company did not actively monitor at least eleven MFS Funds for market timing activity, "because MFS concluded that frequent trading in these funds would not be disruptive to portfolio management and harm fund performance."

5.  On December 9, 2003, *The Wall Street Journal* reported that the MFS Company had established an undisclosed policy, contrary to its public statements to shareholders, which allowed market timing in MFS Funds, including the MFS Emerging Growth Fund, in order to increase its assets under management and management fees generated therefrom. According to the article, "MFS said it 'identified and cancelled millions of dollars of trades that MFS believed could harm fund performance and disrupt portfolio management.' But until recently, MFS said, it didn't monitor daily trading in 11 U.S. large-company stock and high-grade corporate bond funds."

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 80b-14 of the Investment Advisers Act (15 U.S.C. § 80b-14); and 28 U.S.C. §§ 1331,1337.

7.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members

reside within this District. Defendant MFS Company was an active participant in the wrongful conduct alleged herein and is headquartered within this District.

8. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9. Plaintiff Danielle Adams, as set forth in her certification, which is attached hereto and incorporated by reference herein, purchased shares or units of the MFS Total Return Fund, MFS Value Fund, and MFS Fixed Fund during the Class Period and has been damaged thereby.

10. Plaintiff Dean DellaVentura, as set forth in his certification, which is attached hereto and incorporated by reference herein, purchased shares or units of the MFS Value Fund during the Class Period and has been damaged thereby.

11. Each of the MFS Funds, including the MFS Total Return Fund, MFS Value Fund, and MFS Fixed Fund, is a mutual fund that is regulated by the Investment Company Act of 1940, managed by defendant MFS Company, as defined below, and that buy, hold, and sell shares or other ownership units that are subject to the misconduct alleged in this complaint.

12. Sun Life Financial Inc. ("Sun Life") is a financial services company and the ultimate parent of defendants bearing the MFS name. MFS Company is a subsidiary of Sun Life of Canada (U.S.) Financial Services Holdings, Inc., which in turn is an indirect wholly owned subsidiary of Sun Life. Sun Life maintains its United States office at One Sun Life Executive Park SC 2132, Wellesley Hills, Massachusetts 02481.

13. Massachusetts Financial Services Company ("MFS Company") is a subsidiary of Sun Life and offers investment products and money management services. MFS Company is

3

registered as an investment advisor under the Investment Advisers Act and managed and advised the MFS Funds during the Class Period. MFS Company has ultimate responsibility for overseeing the day-to-day management of the MFS Funds. MFS Company, which conducts its advisory business under the name MFS Investment Management, is headquartered at 500 Boylston Street, Boston, Massachusetts 02116. ("MFS Company" and "MFS Investment Management" are referred to interchangeably herein).

14. MFS Municipal Series Trust, MFS Series Trust I, MFS Series Trust II, MFS Series Trust III, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust VI, MFS Series Trust VII, MFS Series Trust VIII, MFS Series Trust IX, MFS Series Trust X, and MFS Series Trust XI are the registrants and issuers of the MFS Funds and are referred to collectively as the "MFS Funds Registrants."

15. Sun Life, MFS Company, MFS Funds Registrants, and the MFS Funds are referred to collectively herein as the "Fund Defendants."

16. The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with the Fund Defendants in the widespread unlawful conduct alleged herein whose identities have yet to be ascertained. Such defendants were secretly permitted to engage in improper timing at the expense of ordinary MFS Funds investors, such as plaintiffs and the other members of the Class, in exchange for which these John Doe defendants provided remuneration to the Fund Defendants. Plaintiffs will seek to amend this complaint to state the true names and capacities of said defendants when they have been ascertained.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

17. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired shares or like interests in any of the MFS Funds, between December 15, 1998 and December 7, 2003, inclusive, and who were damaged thereby. Plaintiffs and each of the Class members purchased shares or other ownership units in MFS Funds pursuant to a registration statement and prospectus. The registration statements and prospectuses pursuant to which plaintiffs and the other Class members purchased their shares or other ownership units in the MFS Funds are referred to collectively herein as the "Prospectuses." Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the MFS Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

21. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of the MFS Funds; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

22. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Introduction: The Double Standard for Privileged Investors

23. Mutual funds, including the MFS Funds, are meant to be long-term investments and are therefore the favored savings vehicles for many Americans' retirement and college funds. However, unbeknownst to investors, from at least as early as December 15, 1998 and until December 7, 2003, inclusive, defendants engaged in fraudulent and wrongful schemes that enabled certain favored investors to reap many millions of dollars in profit, at the expense of plaintiffs and other members of the Class, through secret and illegal timed trading. In exchange

6

for allowing and facilitating this improper conduct, the Fund Defendants received substantial fees and other remuneration for themselves and their affiliates to the detriment of plaintiffs and other members of the Class who knew nothing of these illicit arrangements. Specifically, MFS Company, as manager of the MFS Funds, and each of the relevant fund managers, profited from fees MFS Company charged to the MFS Funds that were measured as a percentage of the fees under management. In exchange for the right to engage in timing, which hurt plaintiffs and other Class members, materially and negatively affecting the value of the MFS Funds, the John Doe Defendants agreed to park substantial assets in the Funds, thereby increasing the assets under MFS Funds' management and the fees paid to MFS Funds' managers. The assets parked in the MFS Funds in exchange for the right to engage in timing have been referred to as "sticky assets." The synergy between the Fund Defendants and the John Doe Defendants hinged on ordinary investors' misplaced trust in the integrity of mutual fund companies and allowed defendants to profit handsomely at the expense of plaintiffs and other members of the Class.

### Secret Timed Trading at the Expense of Plaintiffs and Other Members of the Class

24. "Timing" is an arbitrage strategy involving short-term trading that can be used to profit from mutual funds use of "stale" prices to calculate the value of securities held in the funds' portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the net asset value ("NAV") is calculated. A typical example is a U.S. mutual fund that holds Japanese securities. Because of the time zone difference, the Japanese market may close at 2 *a.m.* New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese securities in his or her fund to arrive at an NAV at 4 *p.m.* in New York, he or she is relying on market information that is fourteen hours old. If there has been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will

7

be artificially low. Put another way, the NAV would not reflect the true current market value of the stocks the fund holds. This and similar strategies are known as "time zone arbitrage."

25. A similar type of timing is possible in mutual funds that contain illiquid securities such as high-yield bonds or small capitalization stocks. Here, the fact that some of the MFS Funds' underlying securities may not have traded for hours before the New York closing time can render the fund's NAV stale and thus open it to being timed. This is sometimes known as "liquidity arbitrage."

26. Effective timing captures an arbitrage profit that comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days, the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

27. Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Trades necessitated by timer redemptions can also result in the realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market.

28. It is widely acknowledged that timing inures to the detriment of long-term mutual fund shareholders and, because of this detrimental effect, the Prospectuses stated that timing is monitored and that the Fund Defendants work to prevent it. These statements were materially false and misleading because the Fund Defendants allowed the John Doe Defendants to time their trades and profit at the expense of ordinary fund investors.

## **Defendants' Fraudulent Scheme**

29. On September 4, 2003 *The Wall Street Journal* reported that the New York Attorney General Elliot Spitzer had filed a complaint in New York Supreme Court alleging that certain mutual fund companies secretly allowed, and in some instances facilitated, a New Jersey-based hedge fund to engage in prohibited and/or fraudulent trading in mutual fund shares (the "Spitzer Complaint"). In return for this favored treatment, which damaged the long-term mutual fund investors, the hedge fund parked funds in financial instruments controlled by the fund companies or their affiliates to increase fund management fees, and entered into other arrangements which benefited the fund companies and/or their affiliates. The article reported as follows regarding the matter:

> Edward Stern . . . finds himself at the center of a sweeping investigation into the mutual-fund industry after paying $40 million to settle charges of illegal trading made by the New York State Attorney General's Office. According to the settlement, Mr. Stern's hedge fund, called Canary Capital Partners LLC, allegedly obtained special trading opportunities with leading mutual-fund families-- including Bank of America Corp's Nations Funds, Bank One Corp., Janus Capital Group Inc. and Strong Financial Corp.-- by promising to make substantial investments in various funds managed by these institutions. [Emphasis in original].

The article indicated that the fraudulent practices enumerated in the Spitzer Complaint were just the tip of the iceberg, stating as follows:

> *In a statement, Mr. Spitzer said "the full extent of this complicated fraud is not yet known," but he asserted that "the mutual-fund industry operates on a double standard" in which certain traders "have been given the opportunity to manipulate the system. They make illegal after-hours trades and improperly exploit market swings in ways that harm ordinary long-term investors."*

(Emphasis added).

30. The Spitzer Complaint received substantial press coverage and sparked additional investigations by state agencies, the SEC and the U.S. Attorney for the Southern District of New York, and led to calls for more regulation and tougher enforcement of the mutual and hedge fund industries. On September 5, 2003, *The Wall Street Journal* reported that the New York Attorney

9

General's Office had subpoenaed "a large number of hedge funds" and mutual funds as part of its investigation, "underscoring concern among investors that the improper trading of mutual-fund shares could be widespread" and that the SEC, joining the investigation, planned to send letters to mutual funds holding about 75% of assets under management in the U.S. to inquire about their practices with respect to market-timing and fund-trading practices.

31.     On December 8, 2003, before the market opened, Sun Life issued a press release over *PR Newswire* announcing that the Boston office of the SEC intended to recommend to the SEC that an enforcement action be brought against MFS Company. In the release, Sun Life stated in relevant part, as follows:

> Sun Life Financial Inc. today said that the staff of the Boston office of the Securities and Exchange Commission (SEC) has indicated that it intends to recommend to the SEC that an enforcement action be taken against Massachusetts Financial Services Company (MFS) alleging, in effect, that the disclosure in certain of MFS' fund prospectuses concerning market timing was false and misleading, and breach of fiduciary duty.
>
> The SEC notice contains no allegations that any MFS employee was knowingly involved in either late trading or inappropriate personal trading in MFS funds.

32.     On the same day, MFS Company sent a letter to MFS Funds shareholders, which was posted on MFS Company's website, in which defendants admitted that they did not monitor trading in eleven MFS Funds for timed and late-trading, contending that such activity was not harmful. The letter stated, in relevant part, as follows:

> To Our Valued Clients:
>
> As you may have heard, MFS has been informed that the staff of the Boston office of the Securities and Exchange Commission (SEC) intends to recommend to the SEC that a civil enforcement action be brought against MFS alleging, in effect, that the disclosure in certain of MFS' fund prospectuses concerning market timing was false and misleading, and breach of fiduciary duty.

10

> We are cooperating fully with the SEC and want to make sure you have a clear understanding of this situation and MFS' procedures designed to prevent excessive trading from disrupting portfolio management and harming fund performance.
>
> First, it is important to note that the SEC notice contains no allegations that any MFS employee was knowingly involved in either late trading or inappropriate personal trading in MFS funds.
>
> With respect to market timing, there has been much coverage in the media of investors who seek to trade rapidly in and out of a mutual fund in order to capture profits by exploiting pricing inefficiencies between the fund's shares and the value of the underlying securities in the portfolio. This could happen, for example, in international funds, where time zone differences between markets create opportunities to profit from arbitrage based on 'stale' prices. It can also occur in funds composed of thinly traded asset classes, such as high-yield bonds, and in small-cap stocks, where sudden large cash flows can have an immediate impact on prices.
>
> MFS monitored trading in these types of funds daily to prevent harm to fund performance and disruption to portfolio management. MFS identified and cancelled millions of dollars of trades that MFS believed could harm fund performance and disrupt portfolio management, and also used fair value pricing of portfolio securities to lessen the attraction of these funds to market timers.
>
> *Until recently, MFS did not monitor daily the trading activity in 11 domestic large-cap stock and high-grade bond funds. MFS believed that daily monitoring with respect to these large and highly liquid funds was unnecessary because MFS concluded that frequent trading in these funds would not be disruptive to portfolio management and harm fund performance. In MFS' judgment, pricing inefficiencies do not exist in these large, highly liquid funds.*
>
> Nevertheless, as the mutual fund industry moves to further restrict frequent trading, MFS has decided to monitor trading activity in these 11 funds. MFS now has exchange limits on all 105 funds in the MFS fund family. [Emphasis added.]

33. On December 9, 2003, *The Wall Street Journal* reported that MFS Company had established an undisclosed policy, contradicting its public statements to MFS Funds

11

shareholders, that permitted market timing in its funds. The article stated, in relevant part, as follows:

> SEC investigators believe such a written, internal policy was used by MFS to increase its assets under management -- and consequently its fees -- by attracting investments at a time when its overall business was declining in a bear market, according to people familiar with the matter. Federal investigators believe senior managers at MFS were aware of the policy, these people said.
>
> * * *
>
> Massachusetts securities regulators are also investigating MFS related to testimony from brokers at the former Prudential Securities that an MFS employee told them that certain funds could be market-timed, despite the prospectuses. . .
>
> ***The funds that MFS allowed to be timed included MFS Emerging Growth Fund. . . . But the Emerging Growth Fund's prospectus states: "The MFS funds do not permit market-timing or other excessive trading practices that may disrupt portfolio management strategies and harm fund performance."*** [Emphasis added.]

### The Prospectuses Were Materially False and Misleading

34. Prior to investing in any of the MFS Funds, including the MFS Total Return Fund, MFS Value Fund, and MFS Fixed Fund, plaintiffs and each member of the class were entitled to and did receive one of the Prospectuses, each of which contained substantially the same materially false and misleading statements regarding the MFS Funds' policies on timed trading.

35. The Prospectuses falsely stated that the MFS Funds actively safeguard shareholders from the recognized harmful effects of timing. For example, in language that typically appeared in the Prospectuses, the April 30, 2003 MFS Growth Opportunities Fund prospectus acknowledged that "short-term trading" is harmful to shareholders and represented that the MFS Funds deters the practice, stating as follows: